2017 MAY 30 AM 9:51

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73064-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| KAREEM HARRIS, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 30, 2017 |

SCHINDLER, J. — To impose criminal liability, the conduct of the defendant must be both the cause in fact and the legal cause of the result. Kareem Harris seeks reversal of the jury conviction of premediated murder in the first degree of Wilbur Lee Gant. Harris contends insufficient evidence supports the jury finding that the injuries Gant suffered when Harris shot him at least five times at close range was the proximate cause of his death. Because sufficient evidence supports the jury finding a direct causal connection between the intentional shooting and the death, we conclude as a matter law Harris is criminally liable, and affirm.

## FACTS

Kareem Harris and Wilbur Lee Gant worked on the assembly line at Milgard Windows & Doors in Fife. At the end of May 2009, operations manager Anthony

Campbell terminated Harris and lead operator John Helsel for "falsification of time records." Campbell asked Gant to fill the lead operator position.

On October 16, 2009, the Washington State Employment Security Department ruled Harris was not entitled to unemployment benefits and ordered Harris to repay $6,885 in benefits he had received.

At approximately 5:00 a.m. on October 28, 2009, Gant was getting ready to leave to go to work in his car. Harris approached the car and shot Gant at close range at least five times. Several neighbors heard the gunshots and Gant's cry for help.

A number of Federal Way Police Department officers responded to the 911 calls, including Officer Brigham Schulz and Lieutenant Kurt Schwan. Officer Schulz saw the car "parked on the side of the road with the door open" and the "driver window was damaged." Gant was lying to the south of the car on the roadway.

Lieutenant Schwan said Gant was lying on his right side on the roadway with "a large amount of blood soaking his pants from the seat of his pants almost all the way down to his legs." Gant told Lieutenant Schwan his "left arm hurt and he had no feeling in his legs." Gant was "alert and conscious." Gant "pleaded" with Lieutenant Schwan "to help him." Lieutenant Schwan used a towel to apply pressure to the area "where the most amount of blood was coming" from until medics arrived. Gant told Lieutenant Schwan, "Kareem Harris shot me."

After the medics arrived and cut off Gant's clothing, Lieutenant Schwan saw a "massive amount of blood," a "hole in the underwear," and wounds to the buttocks, lower abdomen, and hip. Gant arrived unconscious at the emergency room at Harborview Medical Center. Both of Gant's lungs had collapsed as a result of trauma to his chest. Hospital staff inserted an "endotracheal tube to help control his breathing."

2

"[G]iven the location of the bullet wounds and his low blood pressure," doctors decided to operate immediately.

Dr. Joseph Cuschieri performed the surgery to stop the bleeding. Dr. Cuschieri said one third of Gant's total blood supply had pooled in his abdominal cavity. Dr. Cuschieri looked for the source of the bleeding. Gant had bullet wounds in "the left upper quadrant of the abdomen," the right hip, the left inner thigh, the left buttock, the back, and his left elbow. The "major source of bleeding was from his liver." A "bullet had gone through the entire liver from the left side" and "[t]here was a hole in the gall bladder, which sits underneath the liver." The pylorus valve that connects the stomach to the small intestine "also had a hole in it" and the cecum valve that connects the small intestine and colon was damaged.

Dr. Cuschieri repaired the laceration of the liver and removed Gant's gall bladder, the pylorus valve, and the cecum valve. Dr. Cuschieri removed the "dead tissue" from the bullet wound in the abdomen and around the abdominal wall. Dr. Cuschieri temporarily closed Gant's abdomen. After the surgery, Gant was unconscious while in the intensive care unit. Gant was on a ventilator and given blood transfusions.

Dr. Cuschieri performed a second surgery the next day. Because Dr. Cuschieri had removed the pylorus valve, he reconnected the stomach to the small intestine. Because he had removed the cecum valve, Dr. Cuschieri reconnected Gant's small intestine to the colon. Later that day, doctors performed surgery to remove bullet fragments and repair his elbow. Gant remained intubated and on a ventilator.

On October 29, 2009, the State charged Kareem Harris with attempted murder in the second degree of Gant. Harris fled to Miami, Florida.

3

Gant was released from the hospital on November 13, 2009. Gant was in pain. He had to use a wheelchair and had general weakness throughout his body. Harborview psychiatrist Dr. Douglas Zatzick diagnosed Gant as suffering from post-traumatic stress disorder (PTSD).

In January 2010, the police arrested Harris in Miami.

In June 2010, Dr. Dennis Rochier diagnosed Gant with acute bronchitis. Because both of Gant's lungs collapsed after he was shot and X-rays of his lungs showed scarring from being on a ventilator at Harborview, Dr. Rochier treated him with antibiotics.

By September 2010, Gant's physical condition had improved but Dr. Rochier concluded Gant continued to suffer from PTSD and could not return to work.

On December 2, 2010, Dr. Rochier diagnosed Gant with acute bronchitis and treated him with antibiotics. When Dr. Rochier saw Gant on December 22, Gant no longer had bronchitis.

On January 9, 2011, Gant told his spouse Margaret Gant that he did not feel well. Gant was short of breath. After Gant coughed up blood, Margaret called an ambulance. The medics took Gant to the St. Francis Hospital emergency room. Doctors ordered blood tests and a computerized tomography (CT) scan. Blood tests showed Escherichia coli (E. coli) in Gant's bloodstream and his kidney function was compromised. The CT scan showed multiple areas of bacterial infection in his lungs and food particles in his throat. Critical care physician Dr. Manuel Iregui diagnosed Gant with "sepsis," a severe and lethal bacterial infection. Contraction of sepsis can vary from "hours to a couple days." Dr. Iregui told Gant's spouse that "the likelihood

that he would survive this was pretty close to zero." Gant died the next day on January 10, 2011.

King County medical examiner Dr. Timothy Williams performed the autopsy. Dr. Williams concluded the fatal cause of death was "bilateral bronchopneumonia," or pneumonia in both lungs, and the previous or "remote" gunshot wounds. Dr. Williams noted mild emphysema on the lungs and cirrhosis of the liver. The death certificate lists the cause of death as "bilateral bronchopneumonia" and "remote gunshot wounds."

The State filed an amended information charging Harris with premeditated murder in the first degree of Gant in violation of RCW 9A.32.030(1)(a). The information alleged, in pertinent part:

> That the defendant KAREEM HARRIS in King County, Washington, on or about October 28, 2009, with premeditated intent to cause the death of another person, did cause the death of Wilbur Lee Gant, a human being, who died on or about January 10, 2011;

> Contrary to RCW 9A.32.030(1)(a), and against the peace and dignity of the State of Washington[,] . . . [while] armed with a pistol, a firearm as defined in RCW 9.41.010, under the authority of RCW 9.94A.533(3).

Harris entered a plea of not guilty. Harris denied shooting Gant.

The State called a number of witnesses at trial, including Milgard employees; neighbors, including Lloyd Peterson and Mary Boldt; Federal Way police officers; Dr. Cuschieri; Dr. Iregui; Dr. Rochier; Dr. Zatzick; and King County Medical Examiner Dr. Williams.

Milgard employee Myron Woods testified that Harris was angry that he was fired and that he had to pay back his unemployment benefits and called Woods and Gant "about that." Harris told Woods that he "had a .45" that he stored under the seat of his car.

5

Lloyd Peterson testified that at approximately 5:00 a.m. on October 28, he heard the sound of gunshots and went outside. Gant told Peterson that "if anything happens to me, let everybody know Kareem Harris shot me," and "make sure if I die, you'll know who shot me, tell 'em Kareem Harris shot me."

Lieutenant Schwan testified Gant told him, "Kareem Harris. Kareem Harris shot me. He told me he'd do this to me. Kareem Harris did this." Gant told Lieutenant Schwan that Harris "was a coworker, that he worked with him, and that Mr. Harris blamed him for losing his job and getting fired."

Mary Boldt testified that on October 28 between 4:30 a.m. and 5:30 a.m., she heard the sound of "five or six gunshots." Boldt testified that she went outside after the medics arrived and saw Gant on a stretcher. Boldt heard Gant tell the medics "Kareem Harris shot him."

Harborview psychiatrist Dr. Zatzick testified that intentional harm, such as shooting, is "associated with worst post-traumatic stress symptoms." Dr. Zatzick testified that in November 2009, Gant had "multiple symptoms of acute stress," including "problems sleeping, intense fear. He was also in physical pain. And he was having intrusive thoughts, and he was afraid to close his eyes, with a fear that he may not wake up." Gant told Dr. Zatzick that Harris had been angry with him for some time before he "perceived his loss of employment" was Gant's fault. The medical records state, in pertinent part:

> [T]he patient reports that the assailant had been angry at the patient for some time because the assailant perceived his loss of employment at a factory had been facilitated by the patient. The assailant was fired for time card fraud.

The medical records showed that before Gant met Margaret, he was described as a heavy drinker. Margaret Gant testified that Gant would occasionally drink alcohol. But Margaret said in the days before Gant became ill on January 9, 2011, he did not drink much if any alcohol.

Dr. Williams testified that he performed the autopsy to determine the cause and manner of death. During the autopsy, Dr. Williams removed a bullet from Gant's upper right hip and inner right thigh. Dr. Williams testified cause of death was bilateral bronchopneumonia and the gunshot wounds.

Dr. Williams described his examination of the lungs and abdomen. Dr. Williams said scar tissue on the lungs impaired breathing. Dr. Williams also found "barely noticeable" indication of emphysema. Gant had a 12-inch scar on his torso. Dr. Williams found "very severe, very extensive" abdominal scarring that was "on the extreme end." Dr. Williams testified Gant's abdomen "was basically just one matted mass of organs embedded in scar tissue." Dr. Williams testified that Gant's scar tissue reduced the mobility of his organs and impaired the downward movement of food through his gastrointestinal tract. Dr. Williams said scar tissue impaired Gant's ability to cough and "clear out debris" from his airway, placing him at even greater risk of contracting pneumonia through aspiration.

Dr. Williams described two ways E. coli could have infected Gant's lungs— "aspiration" and "inflammation." Dr. Williams testified that removal of the pylorus and cecum valves altered the "orderly movement of material through the gastrointestinal system" and "would have allowed more readily for things to go the other way." Dr. Williams said food particles traveling the "wrong way" through the digestive system could carry bacteria from the colon to the lungs through "aspiration." Dr. Williams

testified that E. coli could have entered Gant's bloodstream through "chronic inflammation" around his colon due to his scar tissue and infected his lungs directly from his bloodstream.

Dr. Williams testified neither emphysema nor cirrhosis were significant diagnoses. Dr. Williams testified the moderate cirrhosis "was not advanced to the point where it impaired liver function."

Kareem Harris and forensic pathologist Dr. Carl Wigren testified on behalf of the defense. Harris admitted he paid his lead supervisor to "clock me out" and was fired for time card fraud. Harris testified that he was "upset" about being fired but he did not shoot Gant. Harris said he left home early in the morning on October 28, 2009, to go to Tacoma.

Defense expert Dr. Wigren testified that based on his review of the medical records, the "linkage of causation of death to pneumonia cannot be attributed to the remote gunshot wound injuries." Dr. Wigren testified the laboratory results that showed ".02[1] alcohol level" suggested Gant "was drinking earlier" and E. coli entered Gant's lungs through aspiration due to his "chronic alcohol abuse." Dr. Wigren testified Gant "could have been passed out and then actually aspirated."

The State called King County Chief Medical Examiner Dr. Richard Harruff in rebuttal. Dr. Harruff testified that "the cause of death was pneumonia due to multiple remote gunshot wounds" and "the manner of death in this case was homicide." Dr. Harruff testified there was no factual basis to support Dr. Wigren's "speculation" that Gant's pneumonia was the result of aspiration due to intoxication. Dr. Harruff said that

---

[1] Blood alcohol concentration.

Gant's scar tissue interfered with his "gut motility, the ability of the digested food and the feces to move through the intestines."

Dr. Harruff described two ways Gant could have contracted E. coli pneumonia:

> One would be because his intestinal tract is not working properly, that the contents could get backed up and he's more — more likely to regurgitate material from his gastrointestinal tract up into his esophagus that he would then aspirate or get into his airway that gets into his lung.
> Another way is that because of the damage to the intestine, the . . . intestinal wall may be more likely to leak the bacteria into the bloodstream from the intestine directly into the bloodstream and then end up in the lung.

The jury found Harris guilty of premeditated murder in the first degree and returned a special verdict finding Harris was armed with a firearm.

## ANALYSIS

Harris contends insufficient evidence supports the jury finding that gunshot wounds were the proximate cause of Gant's death.

Sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). The State has the burden of proving the elements of a crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Borrero, 147 Wn.2d 353, 364, 58 P.3d 245 (2002). Under the Sixth Amendment and the Fourteenth Amendment to the United States Constitution and article I, sections 21 and 22 of the Washington State Constitution, a criminal defendant is entitled to " 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " Apprendi v. New Jersey, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)[2] (quoting United States v. Gaudin, 515 U.S. 506, 510, 115 S. Ct.

---

[2] Alteration in original.

9

2310, 132 L. Ed. 2d 444 (1995)); Jackson v. Virginia, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). The critical inquiry on review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319.

A challenge to the sufficiency of the evidence admits the truth of the State's evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. State v. Johnson, 156 Wn.2d 355, 365-66, 127 P.3d 707 (2006).

Under RCW 9A.32.030(1)(a), "[a] person is guilty of murder in the first degree when . . . [w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person." The court instructed the jury that to convict Harris of premeditated murder in the first degree, the State had the burden of proving beyond a reasonable doubt that Harris acted with premeditated intent "to cause the death of" Gant.[3]

Proximate Cause

The conduct of the defendant must be both " '(1) the actual cause, and (2) the "legal" or "proximate" cause' " of death. State v. Bauer, 180 Wn.2d 929, 935-36, 329 P.3d 67 (2014) (quoting State v. Rivas, 126 Wn.2d 443, 453, 896 P.2d 57 (1995)

---

[3] The court also instructed the jury on the lesser included offenses of attempted murder in the first degree, murder in the second degree, attempted murder in the second degree, and assault in the first degree.

(quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 3.12, at 392 (1986))).

The court used the 11 <u>Washington Pattern Jury Instructions: Criminal</u> 25.02 (3d ed. 2011) (WPIC) to instruct the jury on proximate cause. Jury instruction 18 states:

> To constitute murder, there must be a causal connection between the criminal conduct of a defendant and the death of a human being such that the defendant's act was a proximate cause of the resulting death.
> The term "proximate cause" means a cause which, in a direct sequence, unbroken by any new independent cause, produces the death, and without which the death would not have happened.
> There may be more than one proximate cause of a death.

<u>Cause In Fact</u>

Actual cause in fact, or " ' "the 'but for' consequences of an act," ' " refers to " ' "the physical connection between an act and an injury" ' " and is identical in tort and criminal cases. <u>Bauer</u>, 180 Wn.2d at 936 (quoting <u>State v. Dennison</u>, 115 Wn.2d 609, 624, 801 P.2d 193 (1990) (quoting <u>Hartley v. State</u>, 103 Wn.2d 768, 778, 698 P.2d 77 (1985))).

Viewing the testimony and all reasonable inferences in the light most favorable to the State, substantial evidence supports the jury finding beyond a reasonable doubt that the State proved proximate cause—that but for the gunshot injuries, Gant would not have contracted pneumonia and died.

Dr. Cuschieri testified that if medics had not taken Gant to Harborview after the shooting and "if the hemorrhage, the bleeding, [was] not controlled," Gant "would have died." Dr. Cuschieri testified a second operation was necessary to "put his intestines back together again."

Because the bullets damaged the pylorus and cecum valves, Dr. Cuschieri had to remove the valves and connect Gant's stomach directly to his small intestine and his

small intestine directly to his colon. Dr. Cuschieri said there is no way to "recreate the pylorus." According to Dr. Cuschieri, connecting the stomach directly to the intestines can lead to medical complications because it altered the normal functioning of the gastrointestinal tract. Dr. Cuschieri testified that removal of the valves could "lead to a whole series of complications" because "it's not anatomical, meaning it's not the normal way things are."

Dr. Iregui testified that "anatomic abnormalities," particularly those involving a person's bowels, could cause aspiration. Dr. Iregui said that E. coli can get into the bloodstream through "aspiration" from the gastrointestinal tract.

Dr. Rochier testified that lung damage from the shooting made Gant more susceptible to contracting an infection in his lungs. Dr. Rochier testified that "because of his previous lung damage, I felt [Gant] might be at greater risk for decompensating."

Dr. Williams described the causal relationship between the gunshot wounds and pneumonia.

> Q. . . . [H]ow would the — I guess not necessarily the gunshot wounds themselves, but would the scar tissue formed by the surgeries to repair the damage to the gunshot wounds, would they play in — anywhere in your sort of configuration of the cause of death or the chain of events?
>
> A. Well, both the scar tissue and the removal of parts of the intestines during the treatment. As I talked about, there were two of those key control points, the valves that were removed, and we talked about how that could allow contents to go in both directions or go the wrong way, which could bring it back up. And the airway and the digestive system are connected at the top, so things that are brought back up from the digestive system can gain access to the respiratory system by that method.
>
> Q. Is that sometimes referred to as aspiration?
>
> A. Yes.

12

Although Dr. Williams testified it was impossible to "medically determine" precisely how E. coli entered Gant's lungs, he concluded the injuries from the gunshot wounds caused the infection in Gant's lungs.

> [T]he organism that was identified as the causative agent in the pneumonia was E. Coli, which is an organism that is pretty much universally present in the colon, which was one of the major areas damaged by the gunshot wounds. And . . . the causality is that the damage to the colon facilitated or caused those organisms to get into the lungs, which caused the pneumonia.

Chief Medical Examiner Dr. Harruff testified that Gant's "substantial" gunshot injuries "produced anatomic changes that caused a debilitation of the individual so that he was more vulnerable to developing pneumonia." Dr. Harruff said that because the gastrointestinal tract was "highly damaged" and Gant was "debilitated" from the injuries, "[e]ven small infections become major problems." Dr. Harruff testified with "100 percent" certainty that the gunshot wound injuries were "a major contributing factor" to Gant's death. "I believe, clear and indisputable that those injuries were sufficient enough to contribute to his death."

Legal Causation

In Bauer, the Supreme Court held that legal causation in criminal cases is not the same as legal causation in civil tort cases. Bauer, 180 Wn.2d at 936. Legal causation in civil tort cases is grounded on the determination of how far the consequences of a defendant's act should extend and focuses on whether the connection between the defendant's act and the result is too remote or inconsequential to impose liability.

> Legal causation . . . "involves a determination of whether liability should attach as a matter of law given the existence of cause in fact. If the factual elements of the tort are proved, determination of legal liability will

13

be dependent on mixed considerations of logic, common sense, justice,
policy, and precedent."

Bauer, 180 Wn.2d at 936[4] (quoting Hartley, 103 Wn.2d at 779).

In Bauer, the court held legal causation "in criminal cases differs from, and is narrower than," legal causation in tort cases in Washington. Bauer, 180 Wn.2d at 940. In determining whether liability in a criminal case should attach as a matter of law, legal causation in a criminal case requires " 'a closer relationship between the result achieved and that intended or hazarded.' " Bauer, 180 Wn.2d at 936-37 (quoting 1 WAYNE R. LAFAVE, SUBSTANTIVE Criminal Law § 6.4(c), at 472 (2d ed. 2003)).

Harris relies on Bauer to argue legal causation does not support the conviction. Bauer does not support his argument.

In Bauer, a child took a loaded gun from Douglas Bauer's house. Bauer, 180 Wn.2d at 933. The gun discharged, harming another child. Bauer, 180 Wn.2d at 932-33. The State charged Bauer with assault in the third degree. Bauer, 180 Wn.2d at 933. The State alleged that " '[w]ith criminal negligence,' " Bauer " 'cause[d] bodily harm to another person by means of a weapon.' " Bauer, 180 Wn.2d at 933-34[5] (quoting RCW 9A.36.031(1)(d)). Bauer filed a Knapstad[6] motion, arguing the undisputed facts did not establish guilt as a matter of law. Bauer, 180 Wn.2d at 934. The trial court denied the motion to dismiss. Bauer, 180 Wn.2d at 934.

The Supreme Court addressed whether the trial court erred in denying the Knapstad motion to dismiss. Bauer, 180 Wn.2d at 935. The court held that unlike criminal cases where "the initial act was not only intentional, but felonious, and capable

---

[4] (Emphasis in original) (internal quotation marks omitted).
[5] First alteration in original.
[6] State v. Knapstad, 107 Wn.2d 346, 729 P.2d 48 (1986).

14

of causing harm in and of itself," Bauer's "act of gun ownership . . . is not felonious or criminal." Bauer, 180 Wn.2d at 939. The court stated, "No appellate criminal case in Washington has found legal causation based on negligent acts . . . that were incapable of causing injury directly." Bauer, 180 Wn.2d at 938-39. The court drew a distinction between the imposition of criminal liability in cases such as State v. Leech, 114 Wn.2d 700, 790 P.2d 160 (1990); State v. Perez-Cervantes, 141 Wn.2d 468, 6 P.3d 1160 (2000); and State v. Christman, 160 Wn. App. 741, 249 P.3d 680 (2011), where an intentional criminal act was "capable of causing harm in and of itself" and "where the accused did not actively participate in the immediate physical impetus of harm." Bauer, 180 Wn.2d at 939-40.

> For example, in State v. Leech,[ 114 Wn.2d at 705,] this court held that an arsonist "caused" the death of a firefighter who responded to the arson fire, despite the fact that the firefighter may have been negligent in his fire fighting. . . . The arsonist, however, intentionally started the fire—clearly an intentional criminal act capable of causing harm in and of itself. In State v. Perez-Cervantes, we held that a person who stabs another may be liable for the other's death even if drug abuse also contributed to the death. . . . In contrast to this case, that defendant performed an intentional criminal act—stabbing—that directly caused harm. And in State v. Christman, the Court of Appeals applied causation principles to determine that a person who gives illicit drugs to another may be liable for the other's death from overdose even if other drugs from another source also contributed to the death. . . . Once again, the initial act was not only intentional, but felonious, and capable of causing harm in and of itself.

Bauer, 180 Wn.2d at 939.

The court concluded Bauer's negligent conduct in "leaving guns around his house loaded and accessible to invited children" was not culpability sufficient for commission of the crime and reversed. Bauer, 180 Wn.2d at 946.

> Bauer may have been negligent about leaving loaded guns out in the presence of children. [The child] may have been negligent about enabling a gun enclosed in a backpack to discharge. Bauer's negligence was thus

not the same as the culpability required for "the crime" . . . . Any negligence on Bauer's part thus does not meet the definition of culpability for "the crime" required by RCW 9A.08.020(2)(a). . . . [A]ny negligence on his part was not "culpability . . . sufficient for the commission of the crime," RCW 9A.08.020(2)(a).

Bauer, 180 Wn.2d at 945.

Here, unlike in Bauer, the act of shooting Gant at least five times at close range was an intentional and felonious act capable of causing harm. See Bauer, 180 Wn.2d at 939.

Because sufficient evidence supports the jury finding a direct causal connection between the intentional shooting and the death, we conclude as a matter of law Harris is criminally liable, and affirm.[7]

Schindler, J.

WE CONCUR:

Mann, J.

Spearman, J.

---

[7] Because legal causation is a question of law, we need not address the challenge to the WPIC jury instruction on proximate cause approved by the Supreme Court or the claim that Harris's attorney provided ineffective assistance of counsel in failing to object to giving the instruction. See Leech, 114 Wn.2d at 711; Dennison, 115 Wn.2d at 624. We note the instruction on proximate cause required the jury to find a direct causal connection.