IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>             Respondent,<br><br>          v.<br><br>JAMES NATHAN RUNNION,<br><br>             Appellant. | No. 86211-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — James Runnion appeals his conviction of robbery in the first degree contending that the State failed to prove that he used a threat of force against the bank teller. He also asserts that the trial court abused its discretion by admitting multiple police officers' body-worn video camera recordings of his interactions with the officers soon after the bank robbery. Because the evidence presented at trial considered in the light most favorable to the State was sufficient to support the conviction and because the trial court did not abuse its discretion in admitting the redacted body-worn camera video recordings, we affirm.

FACTS

In August 2023, in the mid-afternoon, an individual, later identified as James Runnion, wearing dark blue jeans, brown boots, a long-sleeved black top, a black hat, and a blue face mask below his chin entered a Wells Fargo bank in Everett. Runnion carried a white paper bag on which was written, line-by-line, in black permanent marker:

This is A Robery [sic]
Big Bills First
$100 $50 $20 $10
No Ones
In the Bag
Now

Mylene Cabrera was working as a bank teller that day when Runnion arrived at the bank. He waited in line until directed to Cabrera's window. He walked up with a piece of paper in one hand and the paper bag in the other acting like he had a check to cash. After he placed the paper bag on the counter in front of the teller, he pulled his blue face mask up over the lower half of his face. Cabrera paused after seeing Runnion's demand message. She later testified at trial that she was scared and shaking. She also said that Runnion then prompted her by slamming his hand, saying, "This is robbery," and telling her to "give me your large bills." After giving him the large bills, Runnion told her to "Give me the rest of the money."

Runnion testified at trial and admitted to writing the robbery message on the bag and presenting it to the teller in order to get money but denied slamming his hand on the counter or saying anything to the teller other than "oh, more money" when he was getting ready to leave and noticed the teller had more money. The bank's security video, which did not include audio, does not show Runnion slamming down his hand and does not show Runnion appearing to leave before Cabrera handed him additional cash.[1]

---

[1] Cabrera acknowledged during cross-examination that, during her interviews with law enforcement immediately after and in the days following the incident, she did not indicate that the man in question had slammed his hand on the counter.

Cabrera described Runnion's actions as "threatening." She later estimated that she had placed between $1,000 to $1,200 of value in the bag before handing it back to the individual. He took the bag, ran out of the bank, but left behind the other piece of paper, which was a Skagit County court document with Runnion's name on it. Security cameras recorded the incident without audio. The bank called the police and gave the officers the piece of paper left by Runnion.

Shortly thereafter, Everett Police contacted Runnion less than half a mile from the bank and detained him in handcuffs. Police transported Cabrera to the scene where she said she was 70 percent sure that Runnion was the person who took money from her at the bank. Police arrested and searched Runnion. Police interactions with Runnion were captured by body-worn video cameras from multiple officers. Redacted recordings from three different officers were admitted at trial over defense objections.

During the interactions, Runnion confirmed his name, but initially denied knowing anything about the bank robbery until police found the paper bag with cash in it hidden in Runnion's underwear.

The State charged Runnion with one count of robbery in the first degree.

At trial, the court, over defense objection, admitted redacted versions of multiple body-worn camera footage of Runnion's interactions with police during his detainment and arrest. After each of the redacted recordings from the body-worn cameras were played for the jury, the trial court read a limiting instruction.

At trial, the State called to testify Cabrera, one of her co-workers, and six law enforcement officers, including those whose body-worn camera footage was admitted. The court also admitted several exhibits, including photographs of the white paper bag with the message written on it, the cash located inside the bag, and screenshots from the video recordings from the bank's security cameras on the day in question.

During cross examination, the State questioned Runnion about the use of the word "robbery."

Q. . . . You knew that, when you said, "This is a robbery," that those words could scare someone. You know that, correct?
A. Yes.
Q. It could cause someone to be in fear, could cause them to be in fear if you say this is a robbery. You knew that?
A. Yes.
Q. And they could perceive that as an implied threat? You knew that too?
A. Yes.
Q. Someone reasonably could feel threatened, and you would know this, that when you say that you're robbing them, that they might be scared?
A. Yes.
Q. Especially if you're wearing a mask and you're in a bank, right?
A. Yes.

The jury found Runnion guilty as charged.

Runnion appeals.

DISCUSSION

Sufficiency of the Evidence

Runnion first asserts that the State did not introduce sufficient evidence to convict him of robbery in the first degree. While he readily admits that he took the money from the bank, he contends that he did so without the "use or threatened

use of immediate force, violence, or fear of injury" to Cabrera. See RCW 9A.56.200. We disagree.

We review a challenge to the sufficiency of the evidence presented during trial de novo. State v. Harris, 199 Wn. App. 137, 146, 398 P.3d 1229 (2017). Evidence is sufficient to support a conviction if, after viewing all of the evidence in the light most favorable to the State, any rational juror could have found the elements of the crime proved beyond a reasonable doubt. State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Our review is "highly deferential to the jury's decision." State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the jury on issues of conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

In considering the sufficiency of the evidence, circumstantial and direct evidence carry equal evidentiary weight. State v. Scanlan, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). As such, circumstantial evidence may be used to establish any element of a crime. State v. Garcia, 20 Wn. App. 401, 405, 579 P.2d 1034 (1978). "The jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference." State v.

Jackson, 112 Wn.2d 867, 875, 774 P.2d 1211 (1989). For a trier of fact to draw inferences from proven circumstances, the inferences must be "rationally related" to the proven facts. Id.

In describing the crime of robbery, our Supreme Court has stated:

"Robbery encompasses any 'taking of . . . property [that is] attended with such *circumstances of terror*, or such threatening by *menace, word or gesture* as in common experience is likely to create an apprehension of danger and induce a man to part with property for the safety of his person.'" State v. Shcherenkov, 146 Wn. App. 619, 624-25, 191 P.3d 99 (2008) (alterations in original) (quoting State v. Redmond, 122 Wash. 392, 393, 210 P. 772 (1922)). To determine whether the defendant used intimidation, we use an objective test. We consider whether an ordinary person in the victim's position could reasonably infer a threat of bodily harm from the defendant's acts. Id. at 625 (quoting 67 Am. Jur. 2d Robbery § 89, at 114 (2003)).

State v. Witherspoon, 180 Wn.2d 875, 884, 329 P.3d 888 (2014) (alteration in original).

Our Supreme Court's decision in State v. Farnsworth, 185 Wn.2d 768, 771-72, 374 P.3d 1152 (2016), is particularly instructive. There, the court indicated that

[r]obbery and theft are closely related crimes. While both offenses involve stealing money or property, theft is elevated to robbery where the defendant uses force or threatened force to take the property. The main question in this case is whether certain conduct constituted a "threat of force," making the crime a robbery, not a theft. The legislature has broadly defined "threat" to specifically include "indirect[ ]" threats. RCW 9A.04.110(28). We have established in our case law that a threat need not be explicit to qualify—a threat can be implied by words or conduct. As we recently held, where an ordinary person could reasonably infer a threat of harm from the defendant's conduct, the defendant made an implied threat of force. State v. Witherspoon, 180 Wn.2d 875, 884, 329 P.3d 888 (2014). Today, we are asked to decide whether, under the circumstances here, respondent Charles Farnsworth's

- 6 -

handwritten note demanding money from a bank teller contained an implied threat of force.

Id. at 771 (alteration in original). James McFarland, Farnsworth's partner in crime, handed a note to the bank teller therein that read, "'No die [sic] packs, no tracking devices, put the money in the bag.'"[2] Id. at 771-72.[3] The teller in Farnsworth

> testified that she instantly knew she was being robbed when she read the note. She said she was "scared" and "in shock." [The teller] complied with the demand "[b]ecause I didn't want anybody else to get harmed, and I didn't know what he was capable of doing." She handed him about $300 in small bills, and [the robber] left.

Id. at 773 (citations omitted). McFarland testified at trial that his and Farnsworth's plan was to commit a robbery. Id. at 778.

The Farnsworth court instructed that, "'[n]o matter how calmly expressed, an unequivocal demand for the immediate surrender of the bank's money, unsupported by even the pretext of any lawful entitlement to the funds, is fraught with the implicit threat to use force.'" Id. at 777 (quoting State v. Collinsworth, 90 Wn. App. 546, 553, 966 P.2d 905 (1997)). The court emphasized that such "a threat need not be direct or explicit to support a robbery conviction. A demand note for money at a bank can carry with it an implied threat of harm if the teller does not comply." Id. at 780. The court thus concluded that,

> [a]lthough the note did not convey an explicitly threatening message, we believe it was laden with inherent intimidation. When a person demands money at a bank, with no explanation or indication of lawful entitlement to money, it can imply a threat of

---

[2] The person who handed the note to the bank teller in Farnsworth was James McFarland, who had planned with Farnsworth to rob a bank.

[3] Notably, unlike the message herein, the note in Farnsworth did not expressly invoke the word "robbery."

force because without such a threat, the teller would have no incentive to comply. An ordinary bank teller could reasonably infer an implied threat of harm under these circumstances.

Id. at 771-72 (emphasis added). Furthermore, according to the court, McFarland's testimony at trial reflected that he and Farnsworth planned to commit a "robbery," a word choice that "illustrate[d] his intent to commit a robbery in the bank, as opposed to the crime of theft." Id. at 778. The court reasoned that, "[u]nder these circumstances, the defendants' conduct conveyed an implied threat of force designed to compel a reasonable person in the teller's position to give McFarland money. Therefore, we find that there was sufficient evidence to demonstrate a threat of force." Id. at 779.

The instant case is analogous to Farnsworth. The words on the white paper bag that Runnion presented to Cabrera at her bank teller window are worth repeating here:

> This is A Robery [sic]
> Big Bills First
> $100 $50 $20 $10
> No Ones
> In the Bag
> Now

Runnion conceded on cross-examination that, if he walked up to someone and said, "This is a robbery," those words could cause someone to be in fear and be perceived as an implied threat, especially if he said as much while wearing a mask in a bank.

Cabrera testified that, after she was handed the paper bag and noticed the message inscribed thereon, she felt "stuck," "scared," and "not able to process" the message written on the bag. She testified that the man's tone of voice was

rushed, heavy, and deep and that it felt threatening to her, captured her attention, and caused her to comply with his demand.[4] She testified that, despite the circumstances, she was able to follow her employee training to remain outwardly calm and hand the money over in response to a robbery.

The State presented sufficient evidence to establish that an ordinary person would reasonably infer an implied threat of harm from Runnion's actions toward Cabrera in the bank. As with the note in Farnsworth, Runnion handed a note to Cabrera "laden with inherent intimidation." Id. at 771-72. Significantly, unlike the note in Farnsworth which did not mention robbery by name, the first phrase of the message Runnion inscribed on the white paper bag read, "This is A Robery [sic]." Such word choice reasonably conveyed to Cabrera that he was intending to rob the bank. An ordinary person would understand that invoking the concept of a robbery in a bank to a bank teller implies a threat of force should the bank teller not immediately comply with the demand. Indeed, as recognized by

---

[4] Runnion relies on the following exchange from Cabrera's cross-examination to support his evidentiary insufficiency claim:

    Q.    On direct, you described him as having a heavy tone or a deep tone. You also described him in a prior interview as quiet; is that accurate?
    A.    Correct.
    Q.    So is it also fair to say that his tone was quiet that day?
    A.    He didn't say anything other than: This is robbery and give me large bills and give me the rest of your money. Those were the only things I can remember he said.
    Q.    Those were the only words as far as you - -
    A.    Correct. Other than that, he was quiet.

Taking the above exchange in the light most favorable to the State, Cabrera's testimony indicates not that Runnion's tone of voice was quiet but, rather, that Runnion "was quiet" in the sense that he did not speak many words during the robbery other than demanding the money. Indeed, on redirect, Cabrera clarified that "[w]hen I said quiet, I meant he wasn't talking." Therefore, Runnion's reliance on the above exchange is unavailing.

our Supreme Court, we "have found that a demand note presented to a bank contains an implied threat based on the social and historical context of bank robberies." Id. at 776 (citing Shcherenkov, 146 Wn. App. at 622-23; Collinsworth, 90 Wn. App. at 551). This is all the more so here given that Runnion explicitly invoked the concept of robbery on the paper bag in question.

In addition, the middle phrases of the message written on the bag demanding the type of bills and where to place them, when considered alongside the notable absence of any indication by Runnion to the bank teller that he was legally entitled to the money that he demanded (such as presenting an account number or a debit card), further reinforces the implied threat of harm to the bank teller should she not comply with his demand. Id. at 771-72 ("When a person demands money at a bank, with no explanation or indication of lawful entitlement to money, it can imply a threat of force because without such a threat, the teller would have no incentive to comply."). Also, the last word in his written message, "NOW", reasonably conveys a sense of urgency, which further implies a threat of harm if the robber's demand is not complied with in a prompt manner. And when Cabrera did not initially place the bills in the bag in accordance with Runnion's demands, he verbally reminded her that "this is robbery." This verbal demand, alongside the written one, bolsters the existence of an implied "threat of force because without such a threat, the teller would have no incentive to comply." Id. at 772. Lastly, Cabrera described Runnion's tone of voice as threatening, heavy, and deep (as opposed to light, joking, or pleasant), and Cabrera's testimony reflected that she felt overwhelmed, unable to think, and scared.

Further bolstering Cabrera's testimony was Runnion's testimony on cross-examination that he knew, under the circumstances, that by writing "This is a robery" on the paper bag, such an utterance would provoke fear in her. This supports that Cabrera, in interpreting Runnion's conduct, had not misunderstood his intention to commit robbery at the time and, as in Farnsworth, his word choice "illustrate[d] his intent to commit a robbery in the bank, as opposed to the crime of theft." Id. at 778.

Taken together, a jury could adopt the foregoing inferences, find Cabrera's testimony credible, and conclude that, as in Farnsworth, an ordinary person in Cabrera's position could reasonably infer that Runnion's "demand note for money at a bank . . . carr[ied] with it an implied threat of harm if [she did] not comply." Id. at 780.

Thus, sufficient evidence supports his conviction for robbery in the first degree.

### Body-Worn Video Camera Recordings

Runnion next asserts that the trial court abused its discretion by admitting the recordings from police officers' body-worn video cameras during their investigation, arrest, and search of Runnion. The court erred, Runnion contends, because the recordings, despite being heavily redacted, were more prejudicial than probative. We disagree.

Generally, all relevant evidence is admissible. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence." ER 401. A trial court may exclude relevant evidence if the danger of unfair prejudice to the defendant substantially outweighs its probative value. ER 403. But just because evidence is prejudicial to the defendant does not automatically render it inadmissible under ER 403—it must be unfairly prejudicial. Carson v. Fine, 123 Wn.2d 206, 224, 867 P.2d 610 (1994). A defendant seeking to exclude evidence bears the burden to show the requisite prejudice. Id. at 225. "Trial courts have considerable discretion to consider the relevancy of evidence and to balance 'the probative value of the evidence against its possible prejudicial impact.'" State v. Barry, 184 Wn. App. 790, 801, 339 P.3d 200 (2014) (quoting State v. Rice, 48 Wn. App. 7, 11, 737 P.2d 726 (1987)). Notably, "the prosecution is generally entitled to prove its case by evidence of its own choice in order to present its case with full evidentiary force." State v. Taylor, 193 Wn.2d 691, 698, 444 P.3d 1194 (2019) (citing Old Chief v. United States, 519 U.S. 172, 186-87, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997)). In addition, we presume that jurors follow the court's instructions. State v. Stenson, 132 Wn.2d 668, 729-30, 940 P.2d 1239 (1997).

In the instant case, Runnion sought to exclude the admission of body-worn video camera recordings showing him in handcuffs being questioned and searched by law enforcement officers following his arrest on suspicion of committing bank robbery. Runnion argued that the footage was of low probative value because "the officers can simply testify about their investigation, as they have done for decades prior to the existence of [body-worn video camera] technology," and because the information depicted in the videos could "come out

through testimony and photographs of the items that were seized, including the money." Also, Runnion argued that his identity was not in dispute because of the evidence of the piece of paper left behind at the bank with his name on it, the bank surveillance video capturing the incident, and eyewitnesses willing to testify as to identification. Notably, prior to this argument, defense counsel had alerted the court that Runnion would not be stipulating that he was the individual in the bank. Runnion also argued that the footage depicting him "in the custody of multiple police officers, handcuffed and being searched is highly prejudicial." Runnion later argued that such evidence was prejudicial because it was similar to showing the jury a defendant handcuffed during trial in a jail uniform with sheriff's deputies nearby.

The State responded that the video recordings were not only highly probative of the search for and identification of the money but also because "there is a lot of skepticism of police officers, especially if they just claim, hey, we had body cam footage. You're not going to see it, but just rely on our word. . . . A lot of jurors don't believe officers whole cloth, which is totally understandable." The State also argued that the footage was not unfairly prejudicial because "jurors would expect that someone who is a suspect in a bank robbery would be detained and handcuffed," whereas jurors would not expect the same of a defendant in a court trial.

After viewing excerpts from the body-worn video cameras recordings before trial, Runnion indicated to the court that, even if the recordings were redacted, he was seeking to exclude all of the video recordings.

The State later proposed a set of redactions to the body-worn camera video recordings from three of the officers. The court ordered additional redactions to those recordings to minimize the frequency with which Runnion was seen in handcuffs and to reduce the otherwise repetitive nature of the nearly contemporaneous recordings. The State also proposed a limiting instruction that read, "You may not use the fact that the defendant was placed in handcuffs by law enforcement to infer guilt or prejudice him in anyway."

Runnion agreed with the verbiage in the State's proposed limiting instruction but otherwise maintained his objection to the admission of the video recordings notwithstanding the redactions. Runnion did not propose his own redactions.

The court denied Runnion's motion to exclude the video recordings. The court determined that the evidence, once redacted, was "very probative and very relevant to the State's case." This was so, the court concluded, because, in light of the potential for juror skepticism regarding the credibility of police officer testimony, the video recordings depicting the investigation and discovery of the stolen bank money on Runnion's person would be more probative than police officer testimony regarding as much.

In addition, the court determined that, if body-worn camera footage capturing the incident in question existed, jurors would expect to have the opportunity to see it. Furthermore, the court continued, the recordings were probative because they contained the officers' actual statements, rather than statements relayed between the officers and later recorded in the officers'

memorializations of the incident, thereby representing a more accurate depiction of the investigation than the memorialized sources. The court also determined that the recordings were probative because they constituted a visual presentation of Cabrera's partial identification of Runnion while he was detained, how long that identification process took, the incriminating evidence being located on Runnion's person, the manner in which Runnion attempted to conceal the evidence, and his statements during the investigation.

The court thus concluded that the evidence of the body-worn video camera recordings were

> more probative than any prejudice or unfair prejudice. And with the instruction that the jury may not consider the fact that he was handcuffed for any purpose to prejudice the defendant, I think that any sort of prejudice will be limited.
>     I would also note that there is a difference, in my opinion, in having someone handcuffed during trial, implying they are not safe to sit here during court, as opposed to out in a scene that's volatile, things moving, other people are around. I think those are two very different things.

After each video clip was played, the court instructed the jury as agreed-to by the parties.[5] Additionally, during his cross-examination of several law enforcement officers, Runnion inquired as to whether it was standard operating procedure for law enforcement to handcuff a suspect during an investigation, to which each officer answered in the affirmative.

---

[5] Prior to each officer's redacted body-worn video camera recordings being played for the jurors, the court stated that the exhibits had been redacted "by agreement of the parties or by ruling of the Court" and instructed that "You are not to speculate as to the content that has been redacted or give any weight to such redactions in your deliberations."

The trial court's reasoning in denying Runnion's evidentiary motion was tenable. With regard to the court's determination that the evidence of the video recordings had high probative value, it was reasonable for the court to conclude that such recordings were more credible, more accurate, and more persuasive when compared to other means by which the State could present the information in question. With regard to its determination regarding unfair prejudice, the court properly recognized that redacting most of the portions of the video recordings depicting Runnion in handcuffs would reduce the risk of unfair prejudice because such depictions were not relevant.

In addition, the court reasonably concluded that presenting the jury with any footage depicting Runnion in handcuffs during the course of a police investigation of a bank robbery was not meaningfully similar to unfair prejudice that may arise from showing a jury a defendant in handcuffs at trial. Indeed, as discussed above, inherent in a bank robbery is an "implied threat of harm," Farnsworth, 185 Wn.2d at 780, and a field investigation of an individual suspected of having committed bank robbery carries with it a reasonable suspicion of the means by which to carry out such a threat being located on the individual's person, resulting, as recognized by the court, in "a scene that's volatile, things moving, other people are around." In contrast, as the court also recognized, "having someone handcuffed during trial" might improperly imply to the jury that the defendant is "not safe to sit here during court." Given that, the court properly concluded that the potential for prejudice arising from showing the jury a recording of a defendant in handcuffs during a potentially volatile field

investigation of a bank robbery and showing a defendant in person in handcuffs during a criminal trial "are two very different things."

Lastly, the danger of unfair prejudice was further minimized by defense counsel's repeated elicitation from law enforcement officers that handcuffing of suspects was standard operating procedure and by the trial court's issuance—on three occasions—of the limiting instruction agreed to by Runnion. We presume that the jurors followed the court's instructions. Stenson, 132 Wn.2d at 729-30.[6] Therefore, in balancing the probative value of the evidence against its potential for unfair prejudice, the trial court did not abuse its discretion in denying Runnion's motion.

Runnion nevertheless asserts that because he openly admitted at trial that he went into the bank, took the money, and then ran out of the bank, the evidentiary value of the videos was not crucial for the State. However, at the time the court considered the motion, though defense argued that there was plenty of other evidence to identify Runnion as the person in the bank, defense was not interested in stipulating as to that fact. And certainly, neither the court nor the State would have known at the time of the motion that Runnion planned to testify and what his testimony would entail.

Runnion also asserts for the first time on appeal that the State's basis for showing the video could have been satisfied in footage totaling just over two minutes in length instead of the admitted 21 minutes of footage. Runnion could

---

[6] Indeed, in arguing that video recordings in question constituted "highly prejudicial evidence," Runnion's appellate briefing does not acknowledge the reduction of prejudice arising from his counsel's cross-examination of the law enforcement officers nor from the trial court's repeatedly issued limiting instruction approved by his counsel.

have but did not make this argument or offer the suggested redaction to the trial court as he does now on appeal. Instead, Runnion objected to the introduction of all video recordings from the body-worn cameras. We decline to consider Runnion's argument made for the first time on appeal and need not determine whether the admitted footage was cumulative in violation of ER 403. State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) ("The general rule is that appellate courts will not consider issues raised for the first time on appeal."). However, even if the trial court had erred in so doing, such admission of evidence was harmless given Runnion's defense theory and the evidence presented at trial.

Non-constitutional errors are harmless, such that reversal is not required, unless "within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected." State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). "'The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole.'" State v. Hill, 6 Wn. App. 2d 629, 647, 431 P.3d 1044 (2018) (quoting State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)).

At trial, in support of the State's theory of the case that Runnion had relied on an implied threat of harm against Cabrera in order to secure the money in question, the State introduced the security camera recordings from the bank, presented exhibits showing the menacing message written on the bag that Runnion handed to Cabrera within the bank, and elicited testimony from Cabrera

regarding Runnion's threatening behavior and the fear and shock she felt as a result.

Runnion's defense theory, for his part, was that he committed the offense of theft in the third degree but did not commit robbery in the first degree. As Runnion argued before the jury in closing,

> [t]he State has failed to prove that there was any use, or threat to use, fear of injury, violence, or force in the taking of this money from Wells Fargo on August 16, 2023.
> This is a theft, not a robbery. If Mr. Runnion had been charged with theft in the first place, we wouldn't be here right now. James Runnion is not guilty of robbery in the first degree.

The court issued instructions to the jury on theft in the third degree, including a to-convict instruction.

Given the evidence presented by the State and Runnion's defense theory, any error arising from the court's admission of the body-worn video camera recordings was harmless. The central disputed question at trial, according to Runnion, was whether "there was any use, or threat to use, fear of in jury, violence, or force in the taking of this money from Wells Fargo on August 16, 2023." The State introduced evidence in support of its theory, including Cabrera's testimony and, based on the jury's verdict, it is reasonable to conclude that the jury found Cabrera's testimony persuasive.

Conversely, the body-worn video camera recordings captured Runnion's interactions with law enforcement after he had already issued his demands and taken the money in question from the bank. Therefore, the officers' body-worn video camera recordings would be of minor significance to the evidence introduced by the State in support of proving that he made an implicit threat of

harm to Cabrera. Thus, even if the body-worn camera recordings had been excluded, the remaining evidence is sufficient to support the conviction.

Runnion nevertheless contends that the video recording evidence in question depicted him as a "dangerous person that required handcuffs," which, according to him, "improperly buttressed the State's theory" of the case. We disagree. As argued by the State before the trial court, a jury would expect "that somebody who is being detained as a suspect in a case would be handcuffed." Furthermore, the State averred, the recordings depicted an interaction between the officers and Runnion that

> is actually fairly friendly and jovial. Even when they find the money on Mr. Runnion, Mr. Runnion is chuckling about it. The officers are joking about it and kind of laughing because the defendant was denying that he had this money on him, and they find this giant wad of cash stuffed in the front of his pants that he claimed was padded underwear. So it isn't as if the environment is one that comes across as intimidating, coercive, mean, mean-spirited, any of those things.

Runnion does not meaningfully challenge this characterization of the video recordings in question. Given all of this, Runnion's contention that the admission of the officers' video recordings improperly buttressed the State's case fails.

Lastly, as discussed above, the jury was instructed to not consider evidence of Runnion in handcuffs while detained as evidence of his guilt of the charged crime, and we presume the jury followed the court's instruction, including whether such evidence supported a finding that Runnion was dangerous. Stenson, 132 Wn.2d at 729-30. Therefore, his claim of harmful error also fails.

Accordingly, for the reasons discussed herein, Runnion does not establish an entitlement to appellate relief.

We affirm.

_____ Coburn, J.

WE CONCUR:

_____ , ACJ   Dwyer, J. _____